**FILED**

NOV 1 4 2011

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEMARY COHORST, CHARMAINE GRIFFITH AND DEIDRE QUENELL, on behalf of themselves and all others similarly situated, | CASE NO. 3:10-CV-2666-JM-BGS<br><br>REPORT AND RECOMMENDATION |
| **PLAINTIFFS;** | |
| V. | |
| BRE PROPERTIES, INC., a Corporation, L1 HOLDING, INC., a South Carolina Corporation, LEVEL ONE, LLC, a South Carolina Limited Liability Corporation REAL PAGE, INC., a Corporation, and DOES 1 through 100, inclusive, | |
| **DEFENDANTS.** | |

REPORT & RECOMMENDATION

## Table of Contents

I. PRELIMINARY STATEMENT ................................................................................................ 4

II. PROCEDURAL HISTORY ................................................................................................ 5

III. CLAIMS ADMINISTRATION PROCESS ................................................................................ 6

IV. RECOMMENDATION BY SPECIAL MASTER ON OBJECTIONS TO FINAL SETTLEMENT ........................... 9

    A. OBJECTION BY WESLEY CARROLL ................................................................................ 9

    B. OBJECTIONS BY YANIQUE DIAS AND GILLIANE GRABER ............................................. 9

    C. OBJECTION OF SUSAN KREIDLER ............................................................................ 11

        1. INADEQUATE CLASS NOTICE'S ........................................................................ 11

        2. CLAIMS ADMINISTRATION COSTS ................................................................... 13

        3. INJUNCTION PERIOD ...................................................................................... 14

        4. DISCOVERY REQUESTS ................................................................................... 14

        5. REVERSION OF SETTLEMENT FUNDS ............................................................. 16

        6. RULING ON MOTION FOR JUDICIAL NOTICE ................................................ 18

        7. RULINGS ON EVIDENTIARY OBJECTIONS FILED TO DECLARATIONS OF OBJECTOR SUSAN

           KREIDLER AND COUNSEL JEFFREY A. KONCIUS ........................................... 18

V. WHETHER THE FINAL SETTLEMENT MERITS APPROVAL ...................................................... 20

    A. GENERAL CONFIRMATION STANDARDS ...................................................................... 20

    B. PLAINTIFFS CASE IS NOT CLEARLY MERITORIOUS .................................................... 21

        1. THERE ARE DEFENSES TO LIABILITY ........................................................... 21

        2. SIGNIFICANT DEFENSES EXIST TO AMOUNT OF DAMAGES ........................... 23

        3. QUESTIONS AS TO PLAINTIFFS ABILITY TO MAINTAIN CLASS CERTIFICATION ..................... 26

    C. RISK AND EXPENSE OF FURTHER LITIGATION ......................................................... 27

    D. THE SETTLEMENT AMOUNT IS ADEQUATE AND THE DISPARATE COMPENSATION OF CLASS

        MEMBERS IS REASONABLE ....................................................................................... 27

    E. VIEWS OF COUNSEL SUPPORT SETTLEMENT ........................................................... 29

    F. REACTION OF CLASS MEMBERS IS FAVORABLE ....................................................... 29

    G. RECOMMENDATION FOR FINAL APPROVAL OF SETTLEMENT ..................................... 30

VI. APPLICATION FOR ATTORNEY FEES AND COSTS TO CLASS COUNSEL ................................... 30

    A. LEGAL STANDARDS GOVERNING THE AWARD OF ATTORNEY FEES IN COMMON FUND

        CASES ...................................................................................................................... 30

2

REPORT AND RECOMMENDATION

B.FACTORS ADVANCED BY CLASS COUNSEL TO JUSTIFY ATTORNEY FEES FOR 30% OF THE
COMMON FUND ................................................................................................................................. 31

   1.RESULTS ACHIEVED ................................................................................................................. 31

   2.RISKS OF LITIGATION .............................................................................................................. 31

   3.SKILL REQUIRED AND THE QUALITY AND EFFICIENCY OF THE WORK................................. 32

   4.THE NOVELTY AND DIFFICULTY OF THE ISSUES PRESENTED ............................................. 32

   5.CONTINGENT NATURE OF THE CASE AND FINANCIAL BURDEN CARRIED BY COUNSEL........ 32

   6.THE MARKET RATE IN SIMILAR COMPLEX CONTINGENT LITIGATION IS 30%...................... 33

   7.REACTION OF THE CLASS SUPPORTS THE REQUESTED AWARD ......................................... 33

C.OBJECTOR KREIDLER'S OPPOSITION TO CLASS COUNSEL'S

   ATTORNEY FEES APPLICATION.............................................................................................. 33

D.RECOMMENDATION ON CLASS COUNSEL'S ATTORNEY FEES AND COSTS
APPLICATION................................................................................................................................34

E.CLASS REPRESENTATION PLAINTIFFS' INCENTIVE AWARDS ................................................... 36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REPORT AND RECOMMENDATION

**I.**

**PRELIMINARY STATEMENT**

This matter came before the Special Master, Herbert B. Hoffman, Judge of the California Superior Court, Ret'd., on September 29, 2011 and October 7, 2011 pursuant to motions of Plaintiffs and Defendants in support of Final Approval of a Settlement of Class Action and objections filed in opposition to the settlement.  Patrick Keegan, Esq., James P. Frantz, Esq. and Howard E. King, Jr., Esq. appeared as class counsel.  Defendant BRE Properties, Inc. was represented by Evan M. Wooton, Esq., Defendants, Level One, LLC and L1 Holdings, Inc. was represented by Sheldon Eisenberg, Esq., Jon P. Kardassakis, Esq. and Tim J. Vanden Heuvel, Esq. Objectors, Yanique Dias and Gilliane Garber was represented by Grace Chang, Esq. and Objector Susan Kreidler was represented by Jeffrey A. Koncius, Esq.

The Special Master has considered the following pleadings filed by the parties and objectors:

1.  Plaintiffs' Notice of Motion for Final Approval of Class Action Settlement and Supporting Memorandum, Declarations, and Request for Judicial Notice;

2.  Defendants' Joinder Memorandum in Support of Final Approval and Declarations;

3.  Objection to Proposed Settlement filed by Objectors Yanique Dias and Gilliane Graber;

4.  Objection of Susan Kreidler to Settlement;

5.  Opposition of Susan Kreidler to (1) Motion for Final Approval of Settlement; and (2) Approval of Award of Attorneys Fees to Class Counsel and Declarations;

6.  Evidentiary Objections of Level One Defendants to Declarations of Jeffrey A. Koncius and Susan Kreidler;

7.  Rebuttal Declaration of Lisa Mullins; and

8.  Order from Judge Miller submitting a handwritten document from putative class member, Wesley Carroll.

The Special Master has also considered the sworn testimony presented by Defendants during the October 7, 2011 hearing of employees of the "ILYM Group," George Pallanes and Lisa M. Mullins.

4

REPORT AND RECOMMENDATION

## II.

## PROCEDURAL HISTORY

On November 17, 2010, Rosemary Cohorst filed a putative class action against BRE and Level One which alleged that Defendants recorded telephone communications without the knowledge or consent of all the parties to the telephone communications in violation of California Penal Code section 630, et seq; negligence; common law invasion of privacy; and California Business and Professions Code section 17200, et seq.  On December 27, 2010, Level One removed the Cohorst case to the Federal Court in San Diego where it was assigned to the Honorable Jeffrey T. Miller, United States District Judge.

After the removal to Federal Court, the parties in *Cohorst* participated in two days of private mediation before the present Special Master on January 21, 2011 and February 2, 2011.  The parties reached a tentative agreement on the second day of mediation and executed a term sheet on February 9, 2011 for a class-wide settlement, subject to confirmatory discovery.  The Settlement Agreement and Release dated as of February 9, 2011 encompasses a twelve-state class ("two-party consent states").

The parties to the Cohorst action jointly filed a Motion for Preliminary Approval of the Class Action Settlement on April 29, 2011 [Doc. No. 24].  Finding the settlement to be fair, proper and reasonable, Judge Miller preliminarily approved the settlement on May 4, 2011 [Doc. No. 25].

Judge Miller's May 4, 2011 Order of Preliminary Approval instructed the Claims Administrator to create a website giving notice of the settlement no later than May 27, 2011; mandated publication of the settlement notice in *USA Today* three times prior to June 10, 2011; and ordered the Claims Administrator to provide individualized e-mail notice to the 1.1 million class members with known e-mail addresses no later than June 10, 2011.  Finally, the May 4, 2011 Order set a deadline for objecting to the settlement on August 9, 2011 and scheduled the Final Fairness Hearing on September 8, 2011.

Pursuant to the Settlement Agreement, Defendants will pay 5.5 million into a common fund, less an award of attorney's fees not to exceed $1.65 million.  Pursuant to a stated formula, the

REPORT AND RECOMMENDATION

1  maximum award to each class member is $5,000 depending on the state of residence of the class
2  member.
3      On May 19, 2011, Proposed Intervenor-Plaintiff Luminita Roman filed a Motion to
4  Intervene or to Stay the May 4, 2011 Preliminary Approval Order.  The Motion to Intervene was
5  heard on July 18, 2011, after the Special Master had denied Roman's *Ex Parte* Application to
6  Shorten Time or to Stay the Order of Preliminary Approval on June 10, 2011.
7      On July 19, 2011, the Special Master filed a report and recommendation that the Motion to
8  Intervene under Rule 24(a)(2) of the Federal Rules of Civil Procedure and Roman's Motion to
9  conduct formal discovery be denied.  After a further hearing on August 5, 2011, this Court adopted
10  the Special Master's Report and Recommendation in its entirety, denied the Roman objections and
11  her motion for reconsideration of the May 4, 2011 Order of Preliminary Approval.
12      On August 24, 2011, the Special Master recommended the granting of Plaintiffs' August 19,
13  2011 *Ex Parte* Application to continue the Final Fairness Hearing from September 8, 2011 to
14  September 29, 2011 and extend the filing date on all papers in Support of the Final Approval from
15  August 25, 2011 to September 15, 2011.  The Special Report and Recommendation of August 24,
16  2011 was not opposed and approved by this Court on August 25, 2011.

17  ### III.

18  ### CLAIMS ADMINISTRATION PROCESS

19      Defendants Level One, LLC and LI Holdings, Inc. (Level One) submitted Declarations of
20  Lisa Mullins, President of ILYM Group, Inc. (ILYM) who provided class action administration
21  services in the instant case as part of its' motion for final approval.  However, since the main focus
22  of the Objectors were directed at issues relating to the notice provided to potential class members,
23  the Special Master ordered a further hearing on October 7, 2011 to address issues relating to the
24  low number of opt-in claims received, the percentages of e-mails delivered or received and the
25  itemization of Claims Administration costs.
26      During the hearing on October 7, 2011, Level One called ILYM Group technology expert,
27  George Pallanes, who was responsible for sending the e-mails and analyzing the results between
28  May 28, 2011 and August 16, 2011.  In an effort to obtain maximum results, ILYM Group

6

REPORT AND RECOMMENDATION

1   conducted three separate "E-Mail Blasts" from the Level One mailing list containing 1,170,584 e-

2   mail addresses.  In the first e-mail blast using six different "white-listed" servers, 1,111,222 e-mails

3   were received by potential class members and 59,362 were "bounced" due to a bad, invalid or non-

4   existent address or blocked by spam.   Two additional e-mail blasts were sent to potential class

5   members after eliminating the bad, invalid or non-existent addresses which resulted in 1,122,552 e-

6   mails received or 95.35% of the original e-mails mailed beginning on May 28 2011.[1]  Mr. Pallanes

7   provided counsel for the parties and the Special Master with an E-Mail Campaign Report dated

8   September 8, 2011 which is attached to the Report and Recommendation at Exhibit No. 1.

9          Level One also called Lisa M. Mullins, the President of ILYM Group who provided

10   testimony regarding the total timely claims received of 1,338 of which 838 relate to persons who

11   stated that they were physically located or resided in California and the remaining 500 from the

12   other two-party consent states.  Ms. Mullins testified that 27 claims were received after the claims

13   deadline on September 8, 2011.

14          Ms. Mullins also provided testimony concerning how class counsel and ICYM Group made

15   decisions concerning class notice and the Claims Administrator's Website launched on May 25,

16   2011.  The website provided a list of properties for which Level One handled calls and toll-free

17   telephone numbers for the Claims Administrator in bold type.  The website records showed that

18   over 47,000 separate log on or hits by potential class members from the Google Search Engine

19   alone.

20          In addition to the e-mail blasts, ILYM Group caused three ads with short form notice to be

21   published in *USA Today* during May and June 2011.  The ILYM Group also fielded at least 155

22   phone calls from potential class members and additional calls were made to class counsel.

23          Ms. Mullins testified that in her experience she has received low claim responses in other

24   consumer class actions and believed that the transient nature of the potential class and lack of name

---

26   [1] Beginning on May 28, 2011 and continuously through June 10, 2011, ILYM e-mailed the class notice and proof of
      claim form, in substantially the same form as filed with the Motion for Preliminary Approval to each of the e-mail

27   addresses provided by Level One (1,170,584 addresses). Beginning on June 30, 2011 and continuing through July 11,
      2011, ILYM delivered a second round of notices by e-mail (1,131,215 addresses). Beginning on August 5, 2011 and

28   continuing through August 16, 2011, ILYM delivered a third round of notices by e-mail (1,129,871 addresses).  The
      delivery rate achieved by ILYM went from 95.28% (first blast) to 98.98% (second blast) to 99.35% (third blast) by
      implementing subtle changes and eliminating addresses identified as no longer existent or bad.

REPORT AND RECOMMENDATION

1  recognition (defendants) were potential causes for the low response rate.  In some telephone calls
2  with potential class members the callers mistakenly thought they were being evicted or rent was
3  being collected.

4      Finally, the Mullins declaration states that the ILYM Group has received only one opt-out
5  filed by Luminita Roman and that it received two objections to the Settlement on behalf of
6  Objectors Susan Kreidler, Gilliane Graber and Yanique Dias.  As of September 15, 2011, the ILYM
7  Group had not received any claim forms from either Graber or Dias.

8      The Special Master notes that Mr. Pallanes and Ms. Mulllins underwent lengthy cross-
9  examination by counsel for the Objectors during the October 7, 2011 hearing, which included the
10  questions concerning the ILYM Group's itemized bill totaling $351,333.  The Special Master found
11  each witness to be knowledgeable about the administration of class action settlements and were
12  credible witnesses who attempted to maximize the notice and information to potential class
13  members concerning the class action settlement.  Mr. Pallanes testified he took a number of
14  measures to insure the successful delivery of a high percentage of the e-mail notifications.  He
15  testified that the six servers ILYM utilized to transmit e-mails were "white-listed" indicating
16  negotiated arrangements with the larger internet service providers (i.e., Google, Yahoo, G-Mail,
17  etc.) to prevent the automatic blocking of bulk e-mailings.  He further testified that the e-mail
18  delivery was appropriately "staged" or "spread out with geographical disbursement and time
19  disbursement . . . to insure that people would receive it in their inbox."  Each e-mail blast took
20  approximately ten days and the "white listed" servers utilized allowed for different release rates
21  (over 20,000 e-mails per server) allowing burst rates to be regulated for optimum efficiency.  While
22  this Court's Preliminary Approval Order required only one round of  e-mail notification to the
23  approximately 1.1 million e-mail addresses identified from Level One's records, ILYM undertook
24  to send two additional rounds of e-mail notices which increased the delivery of e-mails to potential
25  class members.

26  ///
27  ///
28  ///

8

REPORT AND RECOMMENDATION

# IV.
## RECOMMENDATION BY SPECIAL MASTER
## ON OBJECTIONS TO FINAL SETTLEMENT

### A.    Objection by Wesley Carroll

On September 22, 2011, this Court received a handwritten document from a putative class member, Wesley Carroll, currently incarcerated at the Green Rock Correctional Center, Chatham, Virginia, which was forwarded to the Special Master.  This request is not completely legible but appears to be a request for 50 claim forms on behalf of additional unnamed potential class members.  The objection is untimely as being received after the time period to object on August 9, 2011 and should be denied by this Court.

### B.    Objections by Yanique Dias and Gilliane Graber

A written objection to proposed settlement was timely filed by Attorney Grace Chang, Esq. on behalf of Objectors Dias and Graber.  (Chang was erroneously listed as a third Objector on the pleading)  Ms. Chang appeared on behalf of both Dias and Graber at the Final Approval Hearings before the Special Master.  Both Objectors were residents at "Aqua Apartments" which Defendant BRE purchased and managed after September 2010.  Graber's lease ran from July 9, 2010 to August 7, 2011.  Dias' lease ran from December 2009 to July 31, 2011.  Both Graber and Dias are alleged to be class members based upon numerous telephone calls to the BRE maintenance and management onsite at Aqua Apartments.  Neither Graber nor Dias submitted claim forms to the Claims Administrator.

Graber and Dias object to the notice under Rule 23(c) and argue that "Posting fliers in the common areas of the Rental Properties would have been the most practicable cost-efficient and reasonable means of providing notice, but this was not done."  Graber and Dias mistakenly believed that Level One was hired to install the phone lines at Aqua and did not understand the contractual relationship between BRE and Level One.

The Defendants assert that Ms. Dias' declaration establishes that she is not a member of the class because even if the calls she made to BRE (after September 2010) had been handled by the Level One Call Center instead of BRE (on site), Level One was already notifying callers that their

9

1  calls might be recorded.  Level One does concede that Ms. Graber would be a class member based

2  upon another Graber call that was handled by Level One with respect to a different property.

3      The Defendants also argue that since neither Dias nor Graber filed timely claims, they are

4  not aggrieved class members and may not object to the settlement.  In re Worldcom, Inc. Sec.

5  Litig., 2005 WL 2319118 (SD N.Y. Sept. 21, 2005).

6      Nevertheless, the Special Master disagrees with the objections of Graber and Dias on the

7  grounds that posting fliers of the class settlement in the common areas of BRE Properties would

8  have been either reasonable or practicable under the circumstances of this case.  Fed.R.Civ.P.

9  23(c)(2)(3).  BRE Properties accounted for only approximately 5.3% of the properties for which

10  Level One handled calls.  (Baldree Dec. Para. 8).  Moreover, no more than 4.7% of the people who

11  call Level One about BRE properties ultimately rent apartments from BRE.  (Kemmer Decl. Para.

12  8).  Thus, tenants of BRE would not likely constitute much more than 0.25% of the class.  Any

13  notice program directed at BRE's tenants, even if effective and a reasonable expense, would have

14  reached only a minute fraction of the class.  Extending these proposed modes of notice to other

15  customers of Level One accounting for the other 99.75% of the properties it provides service to

16  would not have been possible.  Level One has no authority to enter the property of its other

17  customers or require them to post notices at or on their properties.  (Baldree Dec. Para. 9).

18  Therefore, posting class notice at BRE Properties is not a practical means of providing notice and a

19  mailing to the same group would yield no better results despite the potentially significant cost

20  involved.

21      Finally, Dias and Graber have raised written objections to the content and language

22  contained in the class notice form.  These issues relating to grammatical corrections ("handled" vs.

23  "received") or the failure to describe the roles of the Defendants could have been easily overcome

24  by contacting the Claims Administrator at the toll-free number provided in bold type as done by

25  other potential class members.

26      In regard to the contents of the class notice, the "notice given to the class must fairly apprise

27  the class members of the terms of the proposed compromise and the options open to dissenting

28  class members," *Trotsky v. Los Angeles Fed. Sav. & Loan Assn.*, (1975) 48 Cal.App.3d 134, 151-

10

REPORT AND RECOMMENDATION

152. Here, the notice complied with these requirements and was drafted to provide class members with a fair understanding of the action, the parties, and the nature of the settlement. The notice also states in capital and bolded letters, **"HOW DO I GET ADDITIONAL INFORMATION?"** and provided a toll free number to call. The Claims Administrator, Lisa Mullins, reported up to fifteen (15) telephone inquires a day from these numbers. The Special Master finds that the content of the notice, already considered and approved by this Court, was clearly adequate and met the requirements of FRCP 23.

For the above reasons, the Special Master recommends the objections to the Final Approval by Dias and Graber be denied by this Court.

### C.   Objection of Susan Kreidler

Susan Kreidler, a class member from Hollywood, California, was represented by Paul R. Kiesel, Esq. and Jeffrey A. Koncius, Esq. Kreidler's attorneys previously represented Luminita Roman who elected to opt-out of the class after her Motion to Intervene was denied by this Court on August 5, 2011.

Kreidler's written objection raises many of the same issues which were rejected in the Roman Intervention Motion and need not be repeated in this report (i.e. inadequate discovery; clear sailing fee agreement; reverse auction between counsel.)

### 1.   Inadequate Class Notice

The main thrust of Kreidler's objection raised at the Final Fairness Hearing was directed at the inadequate class notice. Kreidler argues that there were 2.6 million potential class members because the Special Master's Report and Recommendation on Preliminary Approval stated there were 2.6 million unique telephone numbers in the records of Level One. She suggested that the settlement should have required the Claims Administrator to skip-trace the phone numbers to obtain mailing addresses. In addition, there were an additional 16,000 mailing addresses known to the defendants with no e-mail addresses. Further, the mailing addresses once known could have been run through a "National Change of Address Database" for accuracy. Kreidler did not provide the Special Master with any cost estimate for these locating procedures or a declaration from an expert in claims administration supporting Kreidler's objection to the notice provided by ILYM.

11

1    This Court has already determined in its preliminary approval order that the notice program

2    relying primarily on e-mail and publications was the best practicable notice under the

3    circumstances. See e.g. *Lewis v. Wells Fargo & Co.*, 669 F.Supp.2d 1124, 1128-1129 (ND Cal.

4    2009); *Farinella v. Paypal, Inc.* 611 F.Supp.2d 250, 257 (ED N.Y. 2009).  As this Court directed,

5    the Claims Administrator provided individual notice to 1,111,222 potential class members (using

6    six different servers) which after three different e-mail blasts resulted in a 95.35% receipt rate (See

7    Exhibit No. 1).  Level One was in possession of these addresses because it frequently asked callers

8    to provide e-mail addresses as contact information.

9        It was not Level One's practice to ask for or obtain mailing addresses from callers.  Level

10   One only collected a small percentage of mailing addresses (32,000) for which Level One also

11   possessed the caller's e-mail address for approximately half (16,000).

12       Without giving consideration to obvious additional costs which would be incurred in

13   locating and mailing notice to all potential class members, Kreidler fails to adequately address the

14   inherently transient nature of class members and that any addresses obtained by the Claim

15   Administrator were likely to be inaccurate either then or shortly thereafter.

16       The Special Master has considered the evidence presented during the October 7, 2011

17   hearing where employees of the Claims Administrator, "ICYM," provided live testimony on notice

18   and website related issues under cross-examination by Objectors' counsel.  The Special Master

19   believes that the receipt rate of 95.35% of e-mails sent would dwarf the number of successfully

20   received mailings under the "Hunt and Seek" practices suggested by Kreidler's phone number

21   search to find mailing addresses of transient renters.

22       The Supreme Court has declared that Rule 23(c)(2) includes an "unambiguous requirement"

23   that "individual notice must be provided to those class members who are identified through

24   reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S.156, 175-176 (1974).  The Court is to

25   determine what amounts to reasonable efforts under the circumstances of each case, the available

26   information to the parties and possible methods of identification of potential class members.  The

27   hallmark of the notice inquiry in cases before and after *Eisen* is reasonableness.  See *Tulsa*

28

12

REPORT AND RECOMMENDATION

1   *Professional Collection Services, Inc. v. Pope* 485 U.S.478 (1988); *Mullane v. Central Hanover*

2   *Bank and Trust Co.*, 339 U.S. 306 (1950).

3       The Special Master has considered whether the Defendants should be required to provide

4   additional notice to potential class members at this stage of the case. However, the cost of locating

5   unreliable mailing addresses from telephone numbers would be patently unreasonable in light of the

6   limited benefit this gargantuan task would provide. Mailing notice to the 16,000 addresses, which

7   were known to Level One, would likewise be of limited benefit and would unreasonably delay the

8   payment of claims to class members who are presently calling the Claims Administrator to inquire

9   about their anticipated payment. Further, these addresses as to this highly transitory class would

10   almost certainly be outdated or invalid for a class going back to 2003. The Special Master

11   recommends that this Court not order any further notice to potential class members and find that the

12   e-mail and newspaper publication was the best practicable notice under Rule 23(c)(2). See *In Re:*

13   *Domestic Air Transportation Antitrust Litigation*, 141 F.R.D.534, 1992 U.S.Dist. Lexis 1898 (N.D.

14   Georgia); *Sollenbarger v. Mountain States Telephone and Telegraph Co.*, 121 F.R.D.417, 1988

15   U.S.Dist. Lexis 13538 (District of New Mexico).

16       **2.**     **Claims Administration Costs**

17       During the September 29, 2011 Fairness Hearing, Kreidler's counsel questioned the Claims

18   Administrator's costs of approximately $350,000 where no postage was necessary. The Special

19   Master ordered the additional hearing on October 7, 2011 to allow the Claims Administrator to

20   explain the itemization of the "ILYM" charges for class action Claims Administration. During the

21   October 7, 2011 hearing, Lisa Mullins went through the cost breakdown of the "ILYM" charges

22   including cross-examination by Kreidler's counsel.[2] The Special Master is satisfied that the

23   "ILYM" charges were reasonable and project future costs to be incurred in concluding the Claims

24   Administration. Kreidler's concerns about the claims administration's costs were unfounded and

25   not documented by other evidence.

26

27

28

---

[2] Attached hereto as Exhibit No. 2 is the ILYM Group billing in this case which breaks down its' fees into categories for the class action administration tasks.

REPORT AND RECOMMENDATION

1      **3.    Injunction Period**

2            Kreidler's opposition also argues that the settlement is deficient in that it requires the

3 Defendants to comply with the law for only one year (Settlement at para. 4) and that thereafter, the

4 Defendants are free to continue their unnoticed illegal conduct.  Kreidler failed to respond to

5 evidence presented by the Defendant that; (1) at the time of the settlement in February 2011, Level

6 One had sold its assets to Real Page, Inc. and ceased operating the South Carolina call center

7 (Baldree Decl. para 7); and (2) by July 15, 2010, and prior to the sale of its assets, Level One was

8 already providing notice to all callers (Jones Decl. para 9).  Kreidler has not provided any evidence

9 that BRE or Real Page, Inc. have directly engaged in illegal recording of telephone calls.

10 Nevertheless, the injunction does provide benefit that BRE and Real Page, Inc. will not institute a

11 recording policy while the injunction remains in effect.  Kreidler's complaint concerning the length

12 of the injunction period is without meaningful importance and does not render the settlement terms

13 unreasonable.

14      **4.    Discovery Requests**

15            Kreidler's written objection also requested leave to serve discovery upon the Defendants to

16 include but not limited to, the following:

17            1.    Any and all date and documents that would serve to show how many calls

18                  were recorded, when and by whom and what information was collected as

19                  part of those contacts with members of the Class;

20            2.    Any and all information relating to the database structure used by Defendants

21                  as part of their call center operations including, but not limited to, the

22                  software used, manuals, and other programming information;

23            3.    The call recordings of each of the named Plaintiffs to this action and

24                  Objector and the data and information collected during those calls;

25             4.    Any and all documents and other information that was provided by

26                   Defendants to Class Counsel as part of the due diligence discovery; and

27

28

14

5.     Any and all documents or data gathered or possessed by the Claims Administrator relating to the notice program, claims made, "hits" to the settlement website and inquiries made by class members by telephone, e-mail, or regular mail.

While "in appropriate cases, the court will permit an 'objector discovery relevant to the objections,'" *In re: Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (quoting Fed.R.Civ.P. 23, 2003 Advisory Committee Notes, Para. 69), "[c]lass members who object to a class action settlement do not have an absolute right to discovery." *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 619 (S.D.Cal. 2005). In other words, "the Court, may in its discretion, limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement." *Hemphill*, 225 F.R.D. at 619.

In determining whether to permit Objectors to conduct discovery, "[t]he fundamental question is whether the District Judge has sufficient facts before him to intelligently approve or disapprove the settlement." *Hemphill*, supra F.R.D. at 619-20 (citing *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n. 6 (6thCir. 1984)). Courts consider "'the nature and amount of previous discovery, reasonable basis for the evidentiary requests, and number and interest of objectors.'" *Hemphill*, 225 F.R.D. at 620 (quoting *In re: Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D.Ga. 1992)).

The Special Master believes that the information that is needed by this Court to evaluate the fairness of this settlement has been provided in the prior record and the declarations submitted in support of the final approval. The actual call recordings or database structure used by the Defendants in their call center operations would not add to this Court analysis of the settlement terms which already provides for the maximum civil penalties in the two party consent status.

With respect to documents or data gathered or possessed by the Claims Administrator, the Special Master ordered an evidentiary hearing on October 7, 2011 where the Objectors' counsel were allowed to conduct far reaching cross-examination concerning the claims administration process.

15

REPORT AND RECOMMENDATION

1         Kreidler also seeks discovery of the documents provided by Defendants to class counsel as

2    part of the due diligence discovery on grounds that the discovery was insufficient to evaluate the

3    settlement terms. Kreidler's insufficiency assertion is speculative and the production of these

4    documents would violate the mediation privilege.

5         As this Court is aware, this discovery request is being made by a single Objector who is

6    represented by the same counsel who previously sought to intervene and take discovery on behalf

7    of another class member (who has since elected to opt-out). Kreidler has not provided the Special

8    Master with any new evidence beyond the previously rejected claims of collusion which would

9    warrant discovery as an Objector and has apparently abandoned the previous interest in discovery

10   of the settlement negotiations between the parties. See *Lobatz v. U.S. West Cellular of California,*

11   *Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000).

12        Kreidler's discovery requests would not advance the presentation of evidence which may

13   assist this Court in determining the fairness and adequacy of the settlement. Any additional

14   discovery, in the Special Master's judgment, would unduly burden the parties, cause unnecessary

15   delay and potentially reduce funds available to the class. Kreidler's discovery requests should be

16   denied by this Court.

17       5.    **Reversion of Settlement Funds**

18        Objectors have also objected in various forms to a "potential reversion" of settlement funds

19   to the Defendants or their insurers in the event that insufficient claims were made to deplete the

20   $5,500,000 settlement fund. The Defendants believe that the reversion issue would be mooted by

21   the number and geographical spread of claims received by the Claims Administrator. Further,

22   Defendants state that reversion of funds was only contemplated to apply to the return or undelivered

23   settlement checks mailed to class member claimants.

24        The Claims Administrator has now received a total of 1,338 timely claims of which 838

25   relate to persons who stated that they were physically located or residing in California when they

26   made their call during the class period. The remaining 500 timely claims were submitted by class

27   members from the remaining two-party consent states who will receive $1,000.00 per claim.

28

16

REPORT AND RECOMMENDATION

1   (Mulllins Decl. at para. 11).  Ms. Mullins also testified she had received an additional 27 untimely

2   claims at the time of the Final Fairness Hearing.

3          During the Final Fairness Hearing the Special Master was informed that neither the Claims

4   Administrator or the Defendants' counsel have reviewed the submitted claims for approval and will

5   not begin that process until after this Court issues it's final approval order.  It was further

6   represented by the Defendants in their motion for final approval that "Defendants are amendable to

7   simply paying all the California claimants $5,000.00 or a pro-rated share of that higher amount"

8   (Defendants' Joint Memo of Points and Authorities at p. 15).  During the Final Fairness Hearing,

9   Sheldon Eisenberg, Esq, counsel for Level One, stated as follows:

10                  Obviously the claims analysis has to be done.  The Defendants have
11                  now gone on record before the Court both in the papers and now as
                    saying that when the claims analysis is done, there is going to be no
12                  intention of doing that analysis in a way so as to preserve money for a
                    reversion.  Indeed, just the opposite.  We will work with Plaintiffs'
13                  counsel and, if necessary, the Court through its on going jurisdiction
14                  to ensure that all the money is spent.
                    (Tr. of 9/29/11 at p. 86, lines 1-8)
15
16                  And we can work with Plaintiffs' counsel to make sure they're
                    comfortable with whatever the (claims review) process is.  But if
17                  what it takes to spend all the money is paying all California claimants
                    $5,000.00, we're willing to do that . . . I don't think we've ever
18                  said that we wouldn't challenge a claim, but that being said, the
                    intention is clear, we want to spend all the money; that was the
19                  intention.
20                  (Tr. of 9/29/11 at p. 87, lines 11-22)

21
22          Under the settlement agreement the recovery for California class members were divided

23   between up to $5,000.00 to California class members who were recorded less than one year before

     the filing of the action and a maximum recovery of $1,000.00 to class members whose calls were
24
     recorded more than a year before the case filing.  By now agreeing to pay all valid California claims
25
     $5,000.00 or their pro-rated share of $5,000.00, the Special Master expects that the settlement funds
26
     will be fully exhausted (838 "California" claims if valid, multiplied by $5,000.00 is $4,190,000 on
27
     a non-pro-rated basis and the 500 non-California claims if valid multiplied by $1,000.00 is another
28
     $500,000.00 or total claims of $4,690,000).  Thus, given the likely additional amounts to be paid in

                                             17

attorneys fees of at least $1,375,000 and costs of administration of approximately $350,000, the only possibility of the settlement funds not being completely exhausted would be the invalidity of approximately 300-400 "California claims."  Given the representations of the Defendants regarding the claims approval process, the Special Master believes after the claims analysis is completed, such a result is highly unlikely.  Based upon this settlement fund analysis and the Court's continuing jurisdiction over this matter,   the Special Master recommends this Court overrules any objection based upon a potential reversion of settlement funds.

6.    **Ruling on Motion for Judicial Notice**

Plaintiffs and Level One Defendants have requested the Special Master to take Judicial Notice of certain Court filings and transcripts pursuant to Federal Rule of Evidence 201.  These filings included three records of the Superior Court of California in the case of *Phil Raymond v. Carsdirect.com, Inc.,* Los Angeles Superior Court, Case No. BC256282, one record of the Superior Court of the State of California in *Nikki Greenberg v. E-Trade Financial Corporation,* Los Angeles Superior Court, Case No. BC 360102 and the reporter's transcripts of the July 18, 2011 and August 5, 2011 hearings in this matter.

The request for Judicial Notice is appropriately made and documented under FRE 201.  The materials are relevant and probative to the inquiries addressed herein, and was not substantively opposed by the objecting parties.  The Special Master considered the contents of these matters in making this Report and Recommendation.  The Special Master recommends that the Court grant the motion for Judicial Notice in its entirety, and take Judicial Notice of each of the matters requested pursuant to FRE 201.

7.    **Rulings on Evidentiary Objections Filed to Declarations of Objector Susan Kreidler and Counsel Jeffrey A. Koncius**

Written objection has been made by Level One Defendants to paragraphs three and four of the Declaration of Objector Susan Kreidler on the grounds of relevance and lack of foundation (FRE 403).  [Doc. #60].  The declaration focused on how class notice allegedly was found in her computer "spam" folder.  Ms. Kreidler's testimony lacks any foundation or expert opinion regarding the control exerted over her e-mail by her internet service provider or her personal

18

REPORT AND RECOMMENDATION

1   exertion of control over her "spam" filter at the times recited in her declaration. Without such

2   foundation, said testimony is irrelevant.

3       Written objection has also been made by Level One Defendants to paragraphs three and

4   four, and attached Exhibits One and Two of the Declaration of Objector's counsel Mr. Koncius on

5   the grounds of relevance and lack of foundation (FRE 403), lack of personal knowledge (FRE

6   602), speculation and/or improper lay opinion (FRE 701). [Doc. #60].

7       The declaration by Mr. Koncius focuses on computer or website programming and/or

8   engineering, in particular focusing on the coded programming and meaning of coded programming

9   within the class action settlement website. Mr. Koncius' declaration lays no foundation pursuant to

10   FRE 702 for his providing an expert opinion in the area of computer or website programming

11   and/or engineering. Computer or website programming and/or engineering are areas clearly

12   reserved for expert testimony. *Hanger Prosthetics & Orthotics, Inc. v. Glen Ellis, et. al.*, 2008

13   U.S.Dist. LEXIS 91373. Opinion Testimony of Lay Witnesses, is governed by Federal Rule 701,

14   which provides that opinions and inferences can only be received from lay witnesses if they are "(c)

15   not based on scientific, technical, or other specialized knowledge with in the scope of Rule 702"

16   ("Testimony of Experts"). "In other words, lay testimony must 'result from a process of reasoning

17   familiar in everyday life' as opposed to a process 'which can be mastered only by specialist in the

18   field.'" FRE 701.

19       The Special Master has considered the objections on their face and in conjunction with the

20   testimony of technology expert Mr. Pallanes. The proffered testimony of Mr. Koncius is in the

21   nature of expert testimony given by a lay witness with no qualifications establishing sufficient

22   expertise to provide such testimony. The Special Master recommends these objections should be

23   sustained on the grounds requested.

24   ///

25   ///

26   ///

27   ///

28   ///

REPORT AND RECOMMENDATION

1

**V.**

**WHETHER THE FINAL SETTLEMENT MERITS APPROVAL**

2

3      **A.      General Confirmation Standards**

4          The Ninth Circuit has stated that "[w]hen reviewing complex class action settlements, we

5   have a 'strong judicial policy that favors settlements.'" *In re Pacific Enters. Sec. Litig.*, 47 F.3d.

6   373, 378 (9th Cir. 1995). "[T]he Court's intrusion upon what is otherwise a private consensual

7   agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to

8   reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or

9   collusion between the negotiating parties, and that the settlement, taken as a whole, is fair,

10  reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d

11  615, 625 (9th Cir. 1982).  Further, "it must not be overlooked that voluntary conciliation and

12  settlement are the preferred means of dispute resolution." *Id.*

13          Rule 23(e) "requires the district court to determine whether a proposed settlement is

14  fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th

15  Cir. 1998) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).  To do so,

16  the Court must consider a number of fairness factors, including: "[1] the strength of the plaintiffs'

17  case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of

18  maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the

19  extent of discovery completed, and the stage of the proceedings; [6] the experience and views of

20  counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to

21  the proposed settlement." *Id.* (noting that the list of factors is not "exhaustive" and the degree of

22  importance of each factor will depend on the circumstances of each case).  See also Manual for

23  Complex Litigation, 4th Sec. 21.62 (listing factors to consider in reviewing a settlement for final

24  approval).

25          "As an initial matter, 'the fact that the settlement agreement was reached in arm's length

26  negotiations after relevant discovery [has] taken place create[s] a presumption that the agreement is

27  fair.'" *In re Immune Response Sec. Litig.*, 497 F.Supp. 1166, 1171 (S.D. Cal. 2007) (alterations in

28  original) (quoting *Linney v. Cellular Alaska P'ship*, 1997 WL 450064, at *5 (N.D. Cal. July 18,

20

REPORT AND RECOMMENDATION

1   1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998)). For example, voluntary mediation before a retired

2   judge in which the parties "reached an agreement-in-principle to settle the claims in the litigation"

3   are "highly indicative of fairness." *In re Immune Response*, 497 F.Supp.2d at 1171. While this

4   presumption does not completely eliminate the fairness analysis, as the Ninth Circuit noted in

5   *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009), "We put a good deal of stock

6   in the product of an arms-length, non-collusive, negotiated resolution."

7     Here, the parties voluntarily engaged in mediation before a retired judge and undertook

8   informal negotiations and discovery outside of those formal sessions. Accordingly, this court

9   previously found that the "settlement was reached following two days of arm's length negotiations

10   before a neutral mediator." (Order Adopting Rep. & Red. of Special Master). The agreement is

11   presumed fair and the Special Master recommends this Court find that the fairness factors all weigh

12   in favor of approval as discussed below.

13     **B.**   **Plaintiffs' Case is Not Clearly Meritorious**

14       **1.**   <u>**There are Defenses to Liability**</u>

15     Were the litigation to go forward, it is not certain that Plaintiffs would be able to establish

16   several elements of their case: (1) that class members had an objectively reasonable expectation

17   that their calls would not be overheard or recorded; (2) that class members' calls originated in two-

18   party consent states; and (3) that all class members' calls were recorded.

19     As a threshold matter, many of the callers received notification that their calls might be

20   recorded, because their calls were ported to the call center by third party ad sources that provided

21   that notification before transferring calls. (Jones Decl. Para. 8) For example, Rent.com notified

22   callers of recording throughout the class period. (*Id.*) Rent.com ported between 6% and 7% of the

23   calls Level One handled regarding properties owned or managed by BRE and it ported

24   approximately the same percentage of calls regarding other properties. (*Id.*) Those callers hearing

25   the warning would have no expectation of privacy in the communication and therefore cannot

26   recover as class members.

27     Also, as a factual matter, Level One contends it did not record all calls. (Jones Decl. Para.

28   7) Therefore, the fact that a potential class member placed a call that was handled by Level One

21

---

REPORT AND RECOMMENDATION

1   during the relevant time period does not necessarily mean that the caller has a meritorious claim

2   under one of the two-party recording statues.

3        California Penal Code section 632(a) imposes liability on "[e]very person who, intentionally

4   and without the consent of all parties to a *confidential communication* . . . records the confidential

5   communication." (Emphasis added.) A "confidential communication" includes "any

6   communication carried on in circumstances as may reasonably indicate that any party to the

7   communication desires it to be confined to the parties thereto, but excludes a communication made

8   . . . in any other circumstance in which the parties to the communication may reasonably expect

9   that the communication may be overheard or recorded." Cal. Penal Code section 632(c). Many of

10  the other two-party consent states have statutes or case law articulating similar requirements.[3] The

11  statutory protection extends to "any conversation under circumstances showing that a party desires

12  it not to be overheard or recorded" but "excludes a conversation under circumstances where the

13  party reasonably believes it will be overheard or recorded." *Flanagan v. Flanagan* 41 P.3D 575,

14  580 (Cal. 2002)

15       Questions can be raised as to whether the class members' calls (calls largely making simple

16  inquiries about the availability or description of publically-advertised apartments) evidence

17  circumstances in which there could be an objectively reasonable expectation that their calls are not

18  being overheard or recorded. Moreover, other than providing limited contact information in certain

19  circumstances (which the callers provided for the express purpose of having that information

20  recorded), the callers provided little to no private information about themselves.

21       In addition, a caller must be calling from and residing in one of the two-party consent states

22  in order to qualify for statutory damages. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914,

23  920 (Cal. 2006) (conflicts-of-law analysis justified the regulation of out-of-state actors, because

24  "California clearly has an interest in protecting the privacy of telephone conversations of California

25  residents while they are in California sufficient to permit this state, as a constitutional matter to

---

27  [3] *E.g.,* Fla. Stat. Ann. Section 934.2 (defining oral communications); *Benford v. Am. Broad. Co.*, 649 F.Supp. 9, 11 (D.Md. 1986); *Dickerson v.*
    *Raphael*, 601 N/W.2d 108 (Mich. 1999); 18 Pa. Cons. Stat. section 5702 (defining oral communications); and *Lewis v. State Dept. of Licensing*, 139
28  P.3d 1078 (Wash. 2006). In Illinois, not divulging the contents of the call is an affirmative defense. 720 Ill. Comp. Stat. Ann. 5/14-6.
    Conversation under circumstances where the party reasonably believes it will be overheard or recorded." *Glanagan v. Glanagan*, 41 P.3d 575, 580
    (Cal. 2002).

22

REPORT AND RECOMMENDATION

1   exercise legislative jurisdiction over such activity").  While notice was sent to callers with area

2   codes associated with a two-party consent state, a significant percentage of those calls were likely

3   from cell phone callers who would need to establish that they were indeed residing in and calling

4   from a two-party consent state.

5          As such, there could be many potential class members who were actually calling from a

6   state that does not afford "two party consent" protection and thus would not have a meritorious

7   claim under the two party consent laws involved in this action.

8          Finally, there is a significant defense to claims based on calls made from California prior to

9   July 13, 2006.  It was on this date that the California Supreme Court held for the first time that an

10  out-of-state company, like Level One, could be held liable for violating California Penal Code

11  section 632.  *Kearney*, 137 P.3d at 920.  Although the Court held that an out-of-state defendant's

12  conduct would be evaluated under California law from then on, the Court explicitly ruled that the

13  Georgia-based defendant in that case could not be held liable for *past* violations of the statute.  *Id.*

14  at 938-39.

15              **2.    Significant Defenses Exist to Amount of Damages**

16         Statutory damages, such as those provided for by Section 637.2, can be unconstitutional in

17  application under either the California or U.S. Constitution if they constitute "excessive fines" or

18  are imposed without due process of law.  See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,

19  124 P.3d 408, 420-21 (Cal. 2005).  As explained by one appellate court, combining a minimum

20  statutory damages scheme with the class action mechanism "may expand the potential statutory

21  damages so far beyond the actual damages suffered that the statutory damages come to resemble

22  punitive damages – yet ones that are awarded as a matter of strict liability, rather than for the

23  egregious conduct typically necessary to support a punitive damages award." *Parker v. Time*

24  *Warner Entm't. Co.*, 331 F.3d 13, 22 (2d Cir. 2003) (acknowledging the "legitimate concern that

25  the potential for a devastatingly large damages award, out of all reasonable proportion to the actual

26  harm suffered by members of the plaintiff class, may raise due process issues").  This principle

27  could have direct application to Plaintiffs' claims in this case.

28

23

REPORT AND RECOMMENDATION

1    "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the

2    principle of proportionality." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  To determine

3    whether the penalty is proportional, courts examine: (1) the defendant's culpability; (2) the

4    relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4)

5    the defendant's ability to pay.  *Id.* at 337-338 (finding the forfeiture of $357,144 for transporting

6    that amount of money out of the country without filing a customs report was an excessive fine).

7    Similarly, under the due process clause, statutory damages are subject to "the 'guideposts' that the

8    Supreme Court has identified in the context of reviewing the reasonableness of a jury award of

9    punitive damages." *In re Napster, Inc. Copyright Litig.*, No. 00-1369, 2005 WL 1287611, at *11

10   (N.D. Cal. Jun. 2, 2005) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell and Barneck*, 538 U.S.

11   408, 418 (2003)).  An analysis of these factors demonstrate that a large damage award against

12   Defendants for the conduct involved here could present significant constitutional issues.

13   Even assuming cognizable claims, the culpability of the defendants is minimal.  As

14   discussed above, until 2006 it was at best unclear whether California Penal Code section 632 even

15   applied to out-of-state recordings such as the ones created by Level One in South Carolina.  In fact,

16   the *Kearney* case overturned a 2004 appellate court opinion that the California statute did *not* apply

17   to a foreign company such as Level One.  *Kearny v. Salomon Smith Barney, Inc.*, 11 Cal.Rptr. 749

18   (Cal. Ct. App. 2004).  The prevailing authority in California in 2004 was that Level One's conduct

19   was not actionable under Section 632.  Thus, plaintiffs would have to overcome at trial the difficult

20   question of whether the defendants' culpability was sufficient to justify a multi-million dollar

21   punishment.  Level One's potential liability arises solely from a failure to discovery the *Kearney*

22   rule, not from conduct that is obviously or inherently wrong.  The Defendants would argue that

23   these factors render the defendants' level of culpability to be low.

24   Aside from the purely technical nature of the alleged wrongs in this case, the Court would

25   also need to analyze whether the defendants profited by their alleged wrongdoing as part of its

26   culpability determination.  "[The] scale and profitability [of a defendant's conduct] . . . remain

27   relevant to reprehensibility and hence to the size of award warranted." *Johnson v. Ford Motor Co.*,

28   113 P.3d 82, 83 (Cal. 2005).  Plaintiffs have not alleged that Defendants used the recordings for any

24

1    reason outside of locating a potential apartment rental and, in fact, the vast majority of recordings

2    were never used or listened to by a single person. (Baldree Para. 6)

3        There is little relationship between the harm and the statutory damages potentially available

4    in this case. The Plaintiffs do not allege that they have suffered any economic harm as a result of

5    Level One's recordings or that the Defendants ever listened or used the recordings. Instead,

6    Plaintiffs seek a statutorily imposed amount of damages for an alleged unquantifiable harm—the

7    injury to the purported expectation of privacy that class members had when calling inquiring about

8    apartment rentals. As discussed earlier, the Defendants dispute whether the callers had *any*

9    expectation of privacy, let alone enough to justify a multi-million dollar award for the injury to that

10   supposed expectation. Indeed, as the California Supreme Court opined in *Kearney*, "[A]lthough

11   California law expressly authorized the recovery of damages . . . , it is appropriate to recognize that

12   ascribing a monetary value to the invasion of privacy resulting from the secret recording of a

13   telephone conversation is difficult in any event." *Kearney*, 137 P.3d at 938.

14        In 2009, Level One's entire annual net income was $4,323,000. (Baldree Decl. Para 7). Its

15   net income from January through October of 2010 was only $3,655,000. (*Id.*) Under these

16   circumstances, the $5.5 million settlement fund is equivalent to over a year of Level One's profits.

17   Plaintiffs, by way of an early settlement before the expenditure of significant defense costs, have

18   been able to achieve a recovery that already pushes constitutional limits.

19        Because Level One's culpability is minimal, the alleged damages are essentially unrelated to

20   the alleged harm, and the limited number of responsible entities involved, any award in this matter

21   exceeding the amount of the Settlement Fund would be vastly disproportionate to the alleged harm

22   and level of culpability.

23        The focus on the financial status of Level One, as opposed to BRE, for the constitutional

24   analysis is appropriate and warranted because BRE arguably has an additional defense to liability

25   itself. Because Level One, not BRE, was the alleged recorder of the phone calls, BRE has an

26   argument that it could not be held liable under the Invasion of Privacy Act, *Kimmel v. Goland*, 793

27   P.2d 524, n.9 (Cal. 1990) (quoting *Warden v. Kahn*, 99 Cal.App.3d 805, 815 (1979)) (noting that

28   "the invasion of privacy act has been held to provide civil damages only against 'the person who

25

REPORT AND RECOMMENDATION

1   committed the violation'"). Because there is no allegation that BRE itself engaged in the recording

2   of any of the class members' calls, there is a substantial question about whether any judgment could

3   be rendered against BRE individually.

4       The Special Master believes that given the Defendants' defenses to liability and damages,

5   the first fairness factor (the strength of Plaintiff's case) strongly weighs in favor of the settlement

6   that provides for a substantial recovery in the face of many potentially significant problems for the

7   Plaintiffs in obtaining an equivalent recovery after trial.

8           **3.     Questions as to Plaintiffs' Ability to Maintain Class Certification**

9       As in most cases, there is some risk that Plaintiffs might not be able to maintain certification

10   if they were to proceed with litigation, because of individualized factual issues that could arise.  In a

11   Rule 23(b)(3) class action, "questions of law or fact common to class members [must] predominate

12   over any questions affecting only individual members." The predominance inquiry "tests whether

13   proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem v.*

14   *Windsor*, 521 U.S. 591, 623 (1997).

15       If this suit were litigated to conclusion rather than settled, such issues could arise based on

16   the amount of cell phone use in the class and the problem of establishing physical presence in one

17   of the two party states.  Individualized issues could also arise depending on the number of claimants

18   who needed to rely on the discovery rule to establish that their claims were not barred by the statute

19   of limitations.  Individualized damage issues could arise for class members making calls from those

20   states without a statutory minimum award, (Connecticut, Illinois, Michigan, and Montana), who

21   would thus arguably need to make individualized showings of actual damages.  Any class members

22   from the states with statutory minimum damage amounts could also choose to make individualized

23   showings of damages.  As the Supreme Court recently held in *Wal-Mart Stores, Inc. v. Dukes*, 131

24   S.Ct. 2541, 2557 (2011), Rule 23 "does not authorize class certification when each class member

25   would be entitled to an individualized award of monetary damages."  Here, the potential of

26   individualized monetary damages showings for class members from those four states and the

27   entitlement of other class members to do the same could raise questions regarding the basis for

28   certification in this case.  Given the possibility that the above individualized issues could arise

26

1   during litigation and certification could be challenged, the Special Master concludes that the third

2   fairness factor also weighs in favor of settlement.

3       **C.**    **Risks and Expense of Further Litigation**

4       "In most situations, unless the settlement is clearly inadequate, its acceptance and approval

5   are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms.*

6   *Coop. v. DirecTV, Inc.*, 221 F.R.D. 526 (C.D. Cal. 2004). In an express and concerted effort to

7   limit attorneys' fees on both sides, this proposed settlement was reached early in the litigation

8   process, well before significant discovery or motion practice had been undertaken. If the settlement

9   is not approved, the parties will likely engage in expensive and highly contested litigation that is

10   likely to last for several years based on the very substantial and difficult issues identified above.

11   Avoiding such lengthy and expensive litigation strongly militates in favor of settlement.

12       **D.**    **The Settlement Amount is Adequate and the Disparate Compensation of Class**
13                    **Members is Reasonable**

14       "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and

15   expensive litigation that induce consensual settlements. The proposed settlement is not to be

16   judged against a hypothetical or speculative measure of what *might* have been achieved by the

17   negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis in original). Rather, "it is well-settled

18   law that a proposed settlement may be acceptable even though it amounts to only a fraction of the

19   potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomms.*

20   *Coop.*, 221 F.R.D. at 527 (C.D. Cal. 2004) (citing *Linney*, 151 F.3d at 1242).

21       The Settlement Agreement provides that class members with valid claims who resided in or

22   were physically located in California when their calls were handled by the Defendants will each be

23   entitled to a one time payment of five times the Base Settlement Amount up to a maximum of

24   $5000. (Settlement Agreement 3.3) All other class members with authorized claims will be

25   entitled to the Base Settlement Amount of $1000. (*Id.*)

26       Under California Penal Code section 637.2, a plaintiff is entitled to the greater of $5,000 or

27   three times actual damages for violations of the underlying prohibition. Four of the two-party

28   consent states (Connecticut, Illinois, Michigan, and Montana) do not have any similar minimum

27

REPORT AND RECOMMENDATION

1   damage threshold for violations of their prohibitions on unconsented to recording. In the other

2   seven two-party consent states that have statutes addressing the measure of damages (Florida,

3   Maryland, Massachusetts, Nevada, New Hampshire, Pennsylvania and Washington), all of them

4   have minimum damages amounts measured in terms of $1,000 or $100 per day of violation. Md.

5   Code Ann., Cts. & Jud. Proc. Section 10-140; Mass. Gen. Laws ch. 272, section 99(Q); Nev. Rev.

6   Stat. Ann section 200.6909b)(1); N.H. Rev. Stat. Ann section 570-A:11; 18 Pa. Cons. Stat. section

7   5725(a)(a); Wash. Rev. Code section 9.73.060.

8         Because the vast majority of telephone call recordings made by Level One were never

9   addressed or listened to by even a single person, much less used for any reason (Baldree Decl. para.

10  6), actual damage claims by more than a tiny percentage of members of the class would be

11  extremely unlikely. Moreover, although Plaintiffs would likely not agree to this position in the

12  context of litigation, any amount of actual damages would likely be highly speculative. The parties

13  therefore based the settlement amount on the minimum amount of damages specified by the various

14  statutes at issue.

15        On this basis, it appears that California class members are reasonably treated for purposes of

16  the Settlement as having claims worth 5 times the amount of the claims held by class members in

17  other two party consent states. That is because the statutory scheme of $1,000 or $100 per day of

18  violation embodied in the applicable two-party consent statutes has been read by the courts to allow

19  for a maximum claim of $1,000 (unless the statute was violated for more than 100 days with respect

20  to a particular plaintiff). See Noel v. Hall, No. 99-649, 2005 WL 2007876, at *2 (D. Or. Aug. 16,

21  2005). As a result, members of the California class with claims within the statute of limitations

22  have claims that at least on their face are 5 times greater than the value of the claims held by non-

23  California class members. Accordingly, the Settlement has fairly addressed this disparity in its

24  distribution formula set forth in Paragraphs 3.3-3.5, providing for distributions to California class

25  members in an amount that is 5 times greater than the amount available to non-California class

26  members.

27        Based on the number of claims received by the Claims Administrator by the Claims

28  Deadline, the class members will likely receive the maximum or close to the maximum allowed

28

REPORT AND RECOMMENDATION

1  under the settlement.  The potential minimum attorneys' fees award of $1.375 million (Settlement

2  Agreement para. 3.7) and current estimated costs of administration of approximately $351,975

3  (Mulllins Decl. para. 14) leave approximately $3.773 million for distribution to class members.

4  Assuming that the claims of all 838 Californians are valid and that there are 500 valid claims from

5  non-California claimants, the $5.5 million Settlement Funds should be exhausted.

6    **E.   Views of Counsel Support Settlement**

7      "'Great weight' is accorded to the recommendation of counsel, who are most closely

8  acquainted with the facts of the underlying litigation.  This is because the '[p]arties represented by

9  competent counsel are better positioned than courts to produce a settlement that fairly reflects each

10  party's expected outcome in the litigation.'  Thus, 'the trial judge, absent fraud collusion, or the like

11  should be hesitant to substitute its own judgment for that of counsel.'"  *Nat'l Rural Telecomms.*

12  *Coop.*, 221 F.R.D. at 528 (internal citations omitted).  Here, the proposed class counsel and defense

13  counsel have demonstrated a high degree of competence in the litigation of this case, and strongly

14  believe that the settlement is a fair, adequate, and reasonable resolution of the dispute and is

15  preferable to continued litigation.

16    **F.    Reaction of Class Members is Favorable**

17      "It is established that the absence of a large number of objections to a proposed class action

18  settlement raises a strong presumption that the terms of a proposed class settlement action are

19  favorable to the class members."  *In re Omnivision Techs., Inc.*, 559 F.Supp.2d 1036, 1043 (N.D.

20  Cal. 2007) (quoting *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529).  See, *e.g.*, *id.* (3 objections

21  out of 57,630 notices); *Churchill Vill., LLC v. Gen. Elec. Co.*, 361 F.3d 566, 567 (9thCir. 2004)

22  (approving the district court's finding that this fairness factor weighed in favor settlement when

23  "only 45 of the approximately 90,000 notified class members objected to the settlement");

24  *Rodriguez v. West Publ'g Corp.*, No. 05-3222, 2007 WL 2827379, at *10 (C.D.Cal. Sept. 10, 2007)

25  (54 objections out of 376,000 notices).  Notice was provided to 1.1 million potential class members

26  by e-mail, published in *USA Today* to many more, and a website was created.  Only one class

27  member opted out and only a total of three have objected (two of whom lack standing to do so).

28  (See Mullins Decl. para. 10-11).  Moreover, there has been no objection lodged by any of the states'

REPORT AND RECOMMENDATION

1   Attorney Generals who received notice of the settlement. The reaction of the class has therefore

2   been resoundingly favorable and weighs in favor of settlement approval.

3       **G.    Recommendation for Final Approval of Settlement**

4       After having conducted the Final Fairness Hearing on September 29 and October 7, 2011,

5   and reviewed the transcripts of both hearings and the pleadings filed herein, the Special Master

6   recommends that this Court enter an Order providing for Final Approval of the Settlement.

7   **VI.**

8   **APPLICATION FOR ATTORNEY FEES AND COSTS TO CLASS COUNSEL**

9       Pursuant to the terms of the Settlement Agreement disclosed in the Class Notice, Class

10  Counsel have requested this Court award attorney fees of 30% of the Settlement Fund or

11  $1,650,000 and their unreimbursed litigation expenses. Class Counsel believes that this fee would

12  compensate them for their efforts in obtaining the settlement, for the risk in undertaking this

13  representation on a contingency basis and for their continued efforts in this case after the settlement

14  was reached. In addition, it is requested that each of the three "class representatives" receive

15  $5,000 as an incentive award and estimated costs totaling $404,667.10 (inclusive of unreimbursed

16  costs, claims administration fees and costs and Special Master fees). The Defendants have not

17  opposed any of the requests by Class Counsel for the requested amount of attorney fees, class

18  representative incentive awards or any of the costs incurred.

19      **A. Legal Standards Governing the Award of Attorney Fees in Common Fund Cases**

20      Class Counsel seeks a percentage of the funds bestowed on the Class Members in settlement

21  under the "common fund doctrine." A percentage fee is desirable because it most fairly correlates

22  the compensation of counsel to the benefits conferred upon the Class Members. See *Blum v.*

23  *Stenson,* 465 U.S. 886, 900.

24      In *Paul, Johnson, Alston, & Hunt v. Graulty,* 886 F.2d 268, 271 (9th Cir. 1989) the Ninth

25  Circuit opined, "It is well settled that the lawyer who creates a common fund is allowed an extra

26  reward, so that he might share the wealth of those upon whom he has conferred a benefit. The

27  amount of such reward is that which is deemed 'reasonable' under the circumstances." *In Re:*

28  *Washington Pub. Power Sys. Sec. Litg. ("WPPSS"),* 19 F.3d 1291, 1296 (9th Cir. 1994), the

30

REPORT AND RECOMMENDATION

1  Ninth Circuit established a benchmark of 25% of the fund recovery for the determination of Class
2  Counsels' fee award which may be adjusted upward or downward by the Court in cases where the
3  percentage of recovery is either too large or too small. *Paul, Johnson, Alston, & Hunt, supra,* 886
4  F.2d at 272.

5        In determining the amount of fees to be awarded to Class Counsel the Court is required to
6  consider the relationship between the fee award and the degree of success, and has discretion to
7  reduce or increase the fee award. *McGinnis v. Kentucky Fried Chicken of California,* 51 F.3d 805,
8  810 (9th Cir. 1994); *Robins v. Matson Terminals, Inc.* 283 Fed. Appx. 535 (9th Cir. 2008).  In
9  *Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) the Supreme Court recognized that the result
10  achieved by Plaintiffs' counsel is a factor to be considered with other factors including, but are not
11  limited to:  (1) the time and labor required; (2) the novelty and difficulty of the questions involved;
12  and (3) the skill requisite to perform the legal services.  *Kerr v. Screen Extras Guild, Inc.* 526 F.2d
13  67, 69-70, (9th Cir. 1975) cert. denied 425 U.S. 951 (1976).

14
15  **B. Factors Advanced by Class Counsel to Support Attorney Fees for 30% of the Common Fund**

16        In this motion for approval of an award of attorney fees by Class Counsel, the following
17  factors have been identified.

18        **1.   Results Achieved**

19        Courts have consistently recognized that the result achieved is a major factor to be
20  considered in making a fee award. *Hensley v. Eckerhart, supra,* 461 U.S. at 436.  Class Counsel
21  have predicted that based upon the settlement achieved on behalf of the Class and the planned
22  distribution to 1,338 Class Members with valid claims and deductions for attorney fees and costs,
23  the claimants are anticipated to receive a pro-rate distribution equal to a net recovery of 73% of
24  their alleged damages.  (See Memo in Support of Attorney Fees at p. 13)

25        **2.   Risks of Litigation**

26        As previously discussed, Plaintiffs' claims were not clearly meritorious and Class Counsel
27  would have faced significant obstacles in overcoming the asserted defenses by the Defendants to
28

31

REPORT AND RECOMMENDATION

1   liability, damages and class certification.  It is recognized that the risk of costly litigation and trial is

2   an important factor in determining the fee award.  *WPPSS, supra,* 19 F.3d at 1299-1301.

3                  **3.  <u>Skill Required and the Quality and Efficiency of the Work</u>**

4         Class Counsel believes their work on this case was exemplary and a major factor in

5   achieving the result obtained.   An early resolution was accomplished instead of delaying the

6   litigation to generate a greater lodestar amount.  See *Lealao v. Beneficial California, Inc.,* (2000) 82

7   Cal.App.4[th] 19.

8         Class Counsel has submitted three declarations evidencing their hourly rates and services

9   totaling 1,060.75 hours for an aggregate lodestar of $586,635.25.  As outlined in the declaration of

10  Patrick Keegan at paragraphs 11-12, the lodestar includes time billed "for drafting pleadings,

11  motions, discovery, and settlement documentation, reviewing documents and researching legal

12  authorities, preparation for and participation at meetings, Special Master and court appearances and

13  the mediation (including time spent analyzing and computing class data, researching and drafting

14  the mediation brief, and attending the mediation) and communications (telephone conference,

15  correspondence, meetings, e-mails, etc.) with all interested persons, including an expert and

16  opposing counsel, Class Representative Plaintiffs' potential witnesses and Class Members."

17        Class Counsel also pointed out that the quality of opposing counsel was skillful and from

18  prominent law firms and should be considered in evaluating the quality of their work.  See *In Re:*

19  *Equity Funding Grp. Sec. Litig.,* 438 F.Supp. 1303, (C.D. Cal. 1977)

20                 **4.  <u>The Novelty and Difficulty of the Issues Presented</u>**

21        Courts have recognized that the novelty and difficulty of the issues in a case is a significant

22  factor to be considered in making a fee award.  See *Johnson v. Georgia High Express, Inc.,* 488

23  F.2d 714, 718 (5th Cir. 1974).  Class Counsel points out the lack of developed authorities regarding

24  alleged violations of California Penal Code section 630, et seq. on a class wide basis.

25             **5.  <u>Contingent Nature of the Case and Financial Burden Carried by Counsel</u>**

26        A determination of fair attorney fees should include recognition of the contingent nature

27  borne by Class Counsel having received no compensation for almost a year while incurring

28

32

REPORT AND RECOMMENDATION

1   significant expenses in litigating for the benefit of the Class, including claims administration costs

2   and Special Master fees. *WPPSS, supra* 19 F.3d at 1299.

### 6.  The Market Rate in Similar Complex, Contingent Litigation is 30%

4       Class Counsel have cited multiple cases in the Ninth Circuit that reflect attorney fee awards

5   of 30% or more and Objector Kreidler's counsel has argued in a similar case (which the Special

6   Master has taken Judicial Notice) for a 30% fee application.  As such, an award in this percentage

7   would be within the range for class action fees awarded in cases in this settlement range.

8       Class Counsel also asserts if this were a non-representative litigation, the customary

9   attorney contingent fee arrangement would be in the range of 33% to 40% of the recovery.

### 7.  Reaction of the Class Supports the Requested Award

11      As discussed previously, individual notice of the settlement was e-mailed directly to

12  1,170,584 Class Members and 1,338 Class Members have submitted proof of claim forms.  Class

13  Members were informed of the 30% attorney fees application with other cost reimbursement and

14  were advised of their right to object to Class Counsel's fee request.  Since only one Objector

15  (Kreidler) has disputed the attorney fees and costs, the reaction of the Class fully supports the

16  requested fee award.

17

### C.  Objector Kreidler's Opposition to Class Counsel's Attorney Fees Application

18

19      Objector Kreidler filed her opposition to the approval of Class Counsel's application for

20  attorney fees and costs.  Kreidler again complains about a "copycat" complaint and Class Counsel's

21  rush to settlement without adequate formal discovery.  Without giving specific details, Kreidler

22  states that "hard work" by Class Counsel is simply absent and Class Counsel "should receive only a

23  fraction of their lodestar, if anything."

24      Kreidler argues that the Keegan Declaration established that no discovery by Class Counsel

25  was performed before the term sheet was executed on February 9, 2011.  As such, Kreidler finds it

26  hard to comprehend that Class Counsel has expended 1,060 hours of work on this case.

27      Apparently, Kreidler does not attach any significance to the early resolution accomplished

28  in this case.  Kreidler also fails to address the available defenses to liability, damages and class

certification.  Kreidler's counsel's points with pride in its opposition to similar class actions which

33

REPORT AND RECOMMENDATION

1 were eventually settled after years of expensive litigation. However, experienced lawyers know

2 that successful settlement negotiations are dictated by the timing of the negotiations in most cases.

3 The Special Master cannot accept Kreidler's position that Class Counsel's fee application should be

4 discounted because a prompt settlement was accomplished with the Defendants.

5     Kreidler's argument that Class Counsel has not produced evidence of their "hard work" has

6 an odor of sour grapes to it. Judge Miller found in his August 5, 2011 Order (at page 10) denying

7 the Roman Motion to Intervene, as follows:

8
9         However, Roman acknowledges that during the 11-month life of her
action (from May 2010 until dismissal in June 2011), she did not
10         conduct any substantive discovery, she dismissed the alleged primary
wrongdoer (Level One) from her action, and she never entered into
11         any settlement discussions with Defendants.

12     In the Special Master's judgment, the findings of no discovery conducted and

13 misunderstanding of the proper responsible Defendant by Kreidler's counsel in the Roman case

14 would more accurately fit the "lack of hard work" label than Class Counsel's efforts in this

15 litigation. Kreidler's objection to Class Counsel's fee application lacks substance and the Special

16 Master cannot accept the reasons Kreidler advances in her criticism of Class Counsel's attorney fee

17 application.

18     **D. Recommendation on Class Counsel's Attorney Fees and Costs Application**

19     The Special Master has no difficulty in finding that Class Counsel has demonstrated by their

20 fee application an entitlement to a "benchmark" award of 25% of the settlement fund as established

21 by the Ninth Circuit. *Paul, Johnson, supra,* 886 F.2d at 272. Class Counsel seeks an upward

22 adjustment to a 30% award based upon several factors advanced in the fee application. The

23 Defendants do not oppose the requested upward adjustment to 30% of the settlement fund or the

24 requested costs.

25     The Special Master would not have seriously considered the upward fee adjustment had this

26 matter not been complicated by the Motion to Intervene filed by the Kiesel Law firm on behalf of

27 Luminita Roman and the objections to the settlement filed by Susan Kreidler. These legal obstacles

28 caused Class Counsel to vigorously respond to a variety of issues, including allegations of collusion

34

REPORT AND RECOMMENDATION

1 and to incur many additional hours of work time, motion hearings participation and additional

2 costs. Class Counsel was able to prevail against the Roman Intervention Motion including her

3 request to conduct wide-ranging discovery.

4       The Special Master has observed that after the settlement was reached with the Defendants

5 in February 2011, Class Counsel was able to work effectively with Defendants' counsel to obtain

6 this Court's preliminary approval and to assist in the claims administration process. The working

7 relationship accomplished by the lawyers allowed the Class Members to benefit from a prompt

8 resolution instead of delaying the litigation in order to generate a greater lodestar amount. See

9 *Lealao v. Beneficial California, Inc., supra.*

10       Class Counsel has submitted three declarations evidencing the reasonable hourly rate for

11 their services and establishing the number of hours spent working on the case. Prior to the Final

12 Fairness Hearings, the amount of time spent by Class Counsel actively engaged in the litigation was

13 1,060 hours for an aggregate lodestar of $586,635.25 (Keegan Decl. at para. 22). The Special

14 Master would expect that presently the hours increased to 1,200 hours and the aggregate lodestar to

15 approximately $660,000.

16       The reservations which concern the Special Master about recommending the upward

17 adjustment to 30% of the settlement fund include the lack of any adversarial litigation post-

18 settlement other than the Roman Motion to Intervene and the objections to Final Approval. Class

19 Counsel did not have to respond to demurrers, summary judgment, adversarial discovery or an

20 opposition to class certification by the Defendants. Further, as evidenced by the three declarations

21 submitted by Class Counsel in support of attorney fees, Attorney Patrick N. Keegan's law firm took

22 the lead role in this litigation on behalf of Class Counsel. The Special Master concludes that some

23 duplication of effort would exist among the three attorneys.

24       The Special Master also does not completely agree with Class Counsel's position that an

25 analysis of the lodestar confirms the reasonableness of the fee request. Class Counsel suggests that

26 the 30% fee on a percentage basis of $1,650,000 would equate to multiplier of merely 2.85 of the

27 aggregate lodestar. Based upon the Special Master's prior experience as a Superior Court Judge,

28 the proper multiplier in this case would be in the range of 2.0 to at most 2.5.

35

REPORT AND RECOMMENDATION

1        After a careful analysis of all the factors relating to Final Approval and reflection upon

2   Class Counsel's fee application including the results achieved for the class Members and the quality

3   of work performed, the Special Master recommends that this Court approve a fee award to Class

4   Counsel of 28% of the settlement fund or $1,540,000.[4]

5        The Special Master also recommends this Court approve the present estimated costs by

6   Class Counsel of $404,667.10 which includes claims administration fees and costs and Special

7   Master fees.

8        **E. Class Representative Plaintiffs' Incentive Awards**

9        Class Counsel have requested this Court approve an incentive award of $5,000 to each of

10   three (3) appointed Class Representative Plaintiffs reflecting reasonable reimbursement of the time

11   that each of them spent in participating in the litigation.  See Declaration of Howard E. King, Jr. at

12   para 3.  Representative Plaintiffs are entitled to receive appropriate reimbursement for their efforts

13   on behalf of a class from the common settlement fund.  See *Van Vranken v. Atlantic Richfield Co.,*

14   901 F.Supp. 294, 299 (N.D.Cal. 1995); *Cook v. Niedert*, 142 F.3d 1004, 1016 (9th Cir. 1998).

15        In the Special Master's experience an incentive award to three representative plaintiffs in

16   the amount of $5,000 is reasonable and should be approved by this Court.

17        SO RECOMMENDED:

18

19   DATED:  *11/9/11* _____          _____

20                                                           Special Master Judge Herbert B. Hoffman

20                                                           Judge of the California Superior Court (Ret.)

21

22

23

24

25

26

27

28

_____
[4] Using the estimated present lodestar amount of $660,000 the multiplier would be 2.33.

REPORT AND RECOMMENDATION

EXHIBIT 1

# I L Y M | G R O U P
ADMINISTRATIVE SETTLEMENT EXPERTS

| | |
|---|---|
| Case Name: | Rosemary Cohorst vs. BRE Properties, Inc., et al. |
| Email Size: | 1,170,584 |
| Emailing Start Date: | 5/28/2011 |
| Emailing End Date: | 8/16/2011 |

## Email Campaign Report – 9/08/2011

| | BRE Email Blast 1 | BRE Email Blast 2 | BRE Email Blast 3 |
|---|---|---|---|
| **Mailing Information** | **Date** | **Date** | **Date** |
| Mailing Start Date | 5/28/2011 | 6/30/2011 | 8/5/2011 |
| Mailing End Date | 6/10/2011 | 7/11/2011 | 8/16/2011 |

| **Delivery** | **Qty** | **Qty** | **Qty** |
|---|---|---|---|
| Mailing List Size | 1,170,584 | 1,131,215 | 1,129,871 |
| Total Sent to Date | 1,170,584 | 1,131,215 | 1,129,871 |
| Total Received to Date | 1,111,222 | 1,119,301 | 1,122,552 |
| Total Bounced to Date | 59,362 | 11,914 | 7,319 |
| Total Queued for Delivery | 0 | 0 | 0 |
| Total Remaining for Mailing | 0 | 0 | 0 |
| Total Incorrect Addresses | 72 | 0 | 0 |
| Total Bad - Invalid or Non-Existent | 48,969 | 1,344 | 11 |
| Total Blocked by Spam | 10,321 | 10,570 | 7,308 |

| **Tracking** | **Qty** | **Qty** | **Qty** |
|---|---|---|---|
| Received E-mails | 1,111,222 | 1,119,301 | 1,122,552 |
| Bounced E-mails | 59,362 | 11,914 | 7,319 |
| Bounce Rate | 4.72% | 1.02% | 0.65% |

# I L Y M | G R O U P
### A D M I N I S T R A T I V E   S E T T L E M E N T   E X P E R T S

## Case Name: Cohorst v. BRE Properties
### September 8, 2011

EXHIBIT 2

| | |
|---|---|
| Requesting Attorneys Name: | Tim J. Vanden Heuvel |
| Firm | Lewis Brisbois Bisgaard & Smith LLP |
| Contact Number: | 619.669.4926 |
| | |
| Requesting Attorneys Name: | Patrick Keegan |
| Firm: | Keegan&Baker |
| Contact Number: | 619.867.2159 |
| | |
| ILYM Contact | Lisa M. Mullins |
| E-Mail | lisa@ilymgroup.com |
| Contact Number | 714.878.8836 |

| Activity | Rate Type | Unit Cost | Volume | Amount |
|---|---|---|---|---|
| **CASE STARTUP** | | | | |
| Initial Setup - *Import and Formatting of Data* | Hourly | $150.00 | 35 | $5,250.00 |
| Programming of Class Database | Hourly | $150.00 | 60 | $9,000.00 |

**Subtotal    $14,250.00**

| Activity | Rate Type | Unit Cost | Volume | Amount |
|---|---|---|---|---|
| **PROJECT MANAGEMENT** | | | | |
| Project Manager (Case notification and maintenance) | Hourly | $150.00 | 30 | $4,500.00 |
| Staff Hours for Claims Processing | Hourly | $100.00 | 25 | $2,500.00 |
| Staff Hours for Claims Processing (E-claims) | Hourly | $100.00 | 30 | $3,000.00 |
| Report Processing | Hourly | $100.00 | 40 | $4,000.00 |
| Reformatting e-mail addresses | Hourly | $150.00 | 40 | $6,000.00 |

**Subtotal    $20,000.00**

| Activity | Rate Type | Unit Cost | Volume | Amount |
|---|---|---|---|---|
| **NOTIFICATION/MAILING** | | | | |
| Notices/Correspondence/ Mail out claim | Per Piece | $3.00 | 3000 | $9,000.00 |
| E-mail Class Member/ First Time | Flat Fee | $0.04 | 1,170,584 | $46,823.36 |
| E-mail Class Member/2nd Time | Flat Fee | $0.04 | 1,131,215 | $45,248.60 |
| E-mail Members/3rd Time | Flat Fee | $0.04 | 1,129,871 | $45,194.84 |
| Storage, Photocopies, Deliveries | Flat Fee | $500.00 | 1 | $500.00 |
| CAFA Notification | Flat Fee | $2,000.00 | 1 | $2,000.00 |

**Subtotal    $148,766.80**

| Activity | Rate Type | Unit Cost | Volume | Amount |
|---|---|---|---|---|
| **MEDIA CAMPAIGN** | | | | |
| USA Today Newspaper ( Mo-Th) B/W (1/6) | Flat Pricing | 3x | ROP | $97,357.20 |

|  |  |  | **Subtotal** | **$97,357.20** |
|---|---|---|---|---|

| WEBSITE DEVELOPMENT and CALL CENTER SUPPORT | | | | |
|---|---|---|---|---|
| Website Development and Updating | Setup Fee | $2,500.00 | 1 | $2,500.00 |
| Website Hosting | Monthly | $200.00 | 4 | $800.00 |
| eClaims Online Form Development | Hourly | $150.00 | 40 | $6,000.00 |
| IVR Setup (English Only) | Setup Fee | $2,500.00 | 1 | $2,500.00 |
| IRV minutes and long distance | Per Month | $3.00 | 2000 | $6,000.00 |
| Call Center Support | Per Call | $10.00 | 2000 | $20,000.00 |

|  |  |  | **Subtotal** | **$37,800.00** |
|---|---|---|---|---|

| DISTRIBUTION (Includes EIN, Bank Acct /QSF Setup) | | | | |
|---|---|---|---|---|
| Distribution Setup & Management | Hourly | $150.00 | 20 | $3,000.00 |
| Account Reconciliation & Distribution Reporting | Hourly | $150.00 | 22 | $3,300.00 |
| Check Stub & Release - Print (Including IRS Form1099)** | Per Check | $2.00 | 1,338 | $2,676.00 |
| Check Mailing | Per Piece | $1.50 | 1,338 | $2,007.00 |
| Preparation of Taxes | Hourly | $125.00 | 80 | $10,000.00 |
| Social Security Verification | Per Piece | $2.00 | 1,338 | $2,676.00 |
| Annual Filing of Tax Return | Per Year | $2,000.00 | 1 | $2,000.00 |

**Additional Bank fees may apply*

|  |  |  | **Subtotal** | **$25,659.00** |
|---|---|---|---|---|

| CASE CONCLUSION | | | | |
|---|---|---|---|---|
| Data Manager Final Reporting | Hourly | $125.00 | 20 | $2,500.00 |
| Project Manager Final Reporting | Hourly | $125.00 | 20 | $2,500.00 |
| Declaration (to be filed with the Court) | Hourly | $125.00 | 20 | $2,500.00 |

|  |  |  | **Subtotal** | **$7,500.00** |
|---|---|---|---|---|

|  |  |  | **Total Cost** | **$351,333.00** |
|---|---|---|---|---|

1

## PROOF OF SERVICE

2       I am employed in the county of Orange, State of California.  I am over the age of eighteen and not a
party to the within action, and my business address is: 1851 E. First Street, Suite 1600, Santa Ana, CA 92705

3
        On November 9, 2011, I served the following document: **REPORT AND RECOMMENDATION,**
4   on the interested parties in the matter of **COHORST, ET AL. VS. LEVEL ONE, LLC, ET AL.** by placing a true
and correct copy thereof enclosed in a sealed envelope addressed as follows:

5
Howard Edwin King, Esq.
6   Law Offices of Howard Edwin            Paul R. Kiesel, Esq.            Sheldon Eliot Eisenberg, Esq.
    King Jr.                               Jeffrey Koncius, Esq.           Drinker, Biddle & Reath, LLP
7   402 W Broadway, Suite 860              Kiesel, Boucher & Larson LLP    1800 Century Park E, Suite 1400
    San Diego, CA 92101                    8648 Wilshire Blvd.             Los Angeles, CA 90067
8   hedkinglaw@aol.com                     Beverly Hills, CA 90211-2910    sheldon.eisenberg@dbr.com
                                           klesel@kbla.com
9   Patrick N. Keegan, Esq.                koncius@kbla.com                Bronwyn Fitzgerald Pollock, Esq.
    Keegan & Baker, LLP                                                    Evan M. Wooten, Esq.
10  6255 Lusk Blvd., Suite 140                                            Mayer Brown, LLP
    San Diego, CA 92121                    Tim J. Vanden Heuvel, Esq.      350 South Grand Avenue,
11  pkeegan@kmb-law.com                    Jon P. Kardassakis, Esq.        25th Floor
                                           Lewis, Brisbois, Bisgaard &     Los Angeles, CA 90071-1503
12  James Frantz, Esq.                     Smith, LLP                      bpollock@mayerbrown.com
    Frantz Law Group                       701 B Street, Suite 1900        ewooten@mayerbrown.com
13  402 West Broadway, Suite 860           San Diego, CA 92101
    San Diego, CA 92101                    vanden@lbbslaw.com
14  jpf@frantzlawgroup.com                 kardassakis@lbbslaw.com

15  __X__   I am readily familiar with the business' practice for collection and processing of correspondence and
            mailing with the United States Postal Service; such correspondence would be deposited with the
16          United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa
            Ana, California, in the ordinary course of business.

17  __X__   By electronic mail

18  ____    By Facsimile, on _____ at approximately _____. I faxed such document from our facsimile
            telephone number (714) 834-1344 to the offices of the parties as stated on the service list.  The
19          document was transmitted by facsimile transmission and the transmission was reported as complete
            and without error.

20
    __X__   (State) I declare under penalty of perjury under the laws of the State of California that the foregoing
21          is true and correct.

22  ____    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose
            direction the service was made.

23
    Executed on **November 9, 2011**, at Santa Ana, California.

24

25                                                        Rachelle Snow
                                                          Judicate West

26

27

28

## PROOF OF SERVICE